IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Nora F. Lagrone O'Connor, ) | Civil Action No. 6:14-1052-BHH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security, ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on August 25, 2005, alleging that she became unable to work on March 8, 2005. The application was denied initially and on reconsideration by the Social Security Administration. On August 28, 2006, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Feryal Jubran, an impartial vocational expert, appeared on July 22, 2008, considered the case *de novo* and, on August 20, 2008, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 18-34). The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on May 20, 2009. On July 16,

2009, the plaintiff filed an action for judicial review in the United States District Court, District of South Carolina, Charleston Division (3:09-1887-JFA). On September 14, 2010, the district court remanded the case to the Commissioner for further consideration (Tr. 554-74).

Upon remand, the Appeals Council directed an ALJ to conduct a new hearing, take any further action needed to complete the administrative record, and to consider the plaintiff's disability entitlement through the date last insured of December 31, 2010 (Tr. 595-97). The same ALJ held another administrative hearing on June 30, 2011, during which the plaintiff and vocational expert Arthur Schmidt testified (Tr. 505-26). The ALJ issued a decision on August 16, 2011, finding the plaintiff not disabled under the Act through December 31, 2009, which is the incorrect date last insured (Tr. 603-28). The plaintiff appealed this decision, and the Appeals Council remanded the matter to the Commissioner for further administrative proceedings regarding the plaintiff's disability through the correct date last insured, December 31, 2010 (Tr. 631-32).

An administrative hearing was held before a different ALJ on April 23, 2013, during which the plaintiff and vocational expert Thomas Neal testified (Tr. 527-53). The ALJ issued a decision dated May 23, 2013, finding the plaintiff not disabled under the Act through December 31, 2010, the date last insured (Tr. 487-504). On December 9, 2013, the Appeals Council denied plaintiff's request to reverse the ALJ's decision (Tr. 477-80), making the ALJ's decision final for purposes of judicial review. *See* 20 C.F.R. § 422.210(a) (2014). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act on December 31, 2010.
>
> (2)    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March

2

8, 2005, through her date last insured of December 31, 2010 (20 C.F.R §§ 404.1571 *et seq*).

(3)    Through the date last insured, the claimant had the following severe impairments: a microvascular disease, questionable multiple sclerosis, and a mood disorder (20 C.F.R. § 404.1520(c)).

(4)    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, the undersigned finds that from her alleged disability onset date of March 8, 2005, through her date last insured of December 31, 2010, the claimant could perform light work except that she could not climb ladders, ropes, or scaffolds; she could not work at unprotected heights or around hazardous machinery; she was limited to simple, routine, repetitive tasks in an environment where changes are infrequent and are introduced gradually and where there is only casual interaction with the general public; she could work in proximity to co-workers, but would do best working on tasks alone; and she could not do work that involves high production demands.

(6)    Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on September 24, 1962, and was 48 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant was not under a disability, as defined in the Social Security Act, from March 8, 2005, the alleged onset date, through December 31, 2010, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of

4

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id*.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 42 years old on her alleged disability onset date and 48 years old on the date last insured.  She has a high school education and some college.  She has past relevant work experience as an administrative clerk, data entry clerk, and general clerk.

### *Medical Evidence*

In 1999, the plaintiff was seen by a neurologist, John H. Lucas IV, M.D., after an episode of confusion, but her neurological work-up was unrevealing (Tr. 227).  In 2002, she was involved in a car accident and sustained an injury to her cervical spine that required surgery[1]  (Tr. 219, 227, 424, 427).   On March 8, 2005, the plaintiff's alleged disability onset date, she exhibited neurological signs of slurred speech and difficulty balancing  (Tr. 227).  She also ran off the road while driving that day and the day before (Tr. 291).  She went to her primary care physician, Richard Rhodes, D.O.  Dr. Rhodes noted that the plaintiff's daughter had allegedly been molested recently by her father, the plaintiff's ex-husband.[2] Dr. Rhodes suspected a transient ischemic attack ("TIA"), hypoglycemia (low blood sugar), or anxiety (Tr. 291). He ordered a carotid ultrasound and a MRI of the brain (Tr. 286-87).  The carotid ultrasound was negative, but the brain MRI revealed a 2.5 mm nodular white matter lesion felt to reflect non-specific gliosis at the anterior margin of the right external capsule with smaller nodular areas noted in the corona radiata (Tr. 288).

---

[1]  Records from the 2002 motor vehicle accident were not a part of the administrative record, but the neuropsychologist, Brian L. West, Ph.D., who conducted several neuropsychological evaluations in connection with the Social Security claim, questioned whether the plaintiff had sustained a concussion that contributed to her problems after the alleged onset date of disability in 2005 (Tr. 219, 427, 467).

[2]  Medical records after March 2005 reflected that the plaintiff and her daughter received counseling and were involved in family court proceedings regarding these allegations (Tr. 219, 318, 320, 330, 375, 423, 439).

6

Upon referral of Dr. Rhodes, the plaintiff saw neurologist Dr. Lucas on March 16, 2005. Neurological clinical examination was essentially normal except for brisk knee jerks.  Dr. Lucas felt that further consideration should be given to demyelinating disease and to microvascular disease as well as the possibility of a somatoform disorder.  He ordered a complete work-up including echocardiogram, EEG, and nerve conduction study (Tr. 226, 238-39, 242).  These tests were all negative.

On March 23, 2005, Dr. Lucas reviewed the plaintiff's brain MRI and described the small vessel changes as "trivial." He recommended that the plaintiff stop smoking with regard to the microvascular disease (Tr. 225).

On April 25, 2005, the plaintiff underwent a full neuropsychological evaluation by neuropsychologist Brian L. West, Ph. D., of Charleston Psychiatry, LLC, to help determine whether her complaints were caused by somatoform disorder or microvascular disease and cognitive loss.  The plaintiff's attention functions were found to be significantly impaired.  On the Stroop Test, the plaintiff scored at the lowest 6th percentile, which suggested significantly slowed information processing speeds.  Testing with the Connor's Continuous Performance Test, II Edition, suggested "significantly impaired attention regulation."  Other scores on the Connor's Test "would suggest arousal maintenance problems that are influencing attention regulation" and language functioning was impaired with "some evidence of dysnomia." Psychopathology screening suggested "probable mood fluctuating disorder," and elevated scores were present for "passive-aggressive and self-defeating thought process" (Tr. 219-222).

Dr. West diagnosed cognitive disorder not otherwise specified with evidence of attention regulation problems, naming difficulties, slow processing speeds, and slow reaction times all suggestive of frontal lobe focal concerns; mood disorder with cycling characteristics noted by psychometric measure; and somatoform disorder to be ruled out

through psychiatric evaluation.  Dr. West indicated that efforts should be made to rule out a possible sleep disorder and possible encephalopathy. (Tr. 221-22).

Dr. Lucas saw the plaintiff on May 9, 2005, to review Dr. West's neuropsychological evaluation. He noted that the plaintiff cried at times during the examination and was "somewhat hyperverbal." Dr. Lucas recommended psychiatric treatment though the plaintiff was adamant that she did not have any psychiatric problems except for being under stress.  She also denied trouble sleeping although she admitted that she had to take Ativan almost every night to sleep and that she woke up with a headache. Dr. Lucas ordered a sleep study.  The sleep study was conducted in June, but the results indicated that the plaintiff did not have a sleep disorder.  Dr. Lucas also noted that the plaintiff had mild microvascular cerebrovascular disease and that in his opinion she had a somatoform disorder.  He also completed a work certificate indicating that the plaintiff could not go back to work until additional testing was completed, probably in a couple of weeks (Tr. 231-352).

On June 14, 2005, the plaintiff had an initial evaluation with Perry E. Trouche, M.D., a psychiatrist with Charleston Psychiatry, LLC.  On June 23, 2005, Dr. Trouche prepared a work excuse form indicating that it was undetermined when the plaintiff could return to work (Tr. 446). He diagnosed her with a cognitive disorder, anxiety disorder, possible mood disorder or depression, with history of TIA and neurological symptoms (Tr. 320, 440, 444).  On June 28th, he completed an Attending Physician Form indicating that the plaintiff was unable to work due to her condition and that her prognosis for response to treatment was "fair" (Tr. 444-45).

On July 6, 2005, Dr. West completed a disability rating form regarding the plaintiff's long-term disability plan (Tr. 432-33).  He assessed a cognitive disorder and mood disorder with symptoms of anxiety mood changes and neurocognitive deficits (processing speeds, decreased attention, reduced reaction times, and reduced language skills) based

on neuropsychological evaluation. He also indicated that the plaintiff was unable to work due to cognitive limits and that expected response to treatment was "fair" (Tr. 432-33).

Dr. Lucas saw the plaintiff on July 7, 2005, at which time the plaintiff reported that she still had difficulty with concentration. Dr. Lucas diagnosed microvascular disease, which was partially related to tobacco use. He also renewed his opinion that a somatoform disorder was the "predominant cause of her symptoms" (Tr. 224). Dr. Lucas completed an Attending Physicians Statement form dated July 5, 2005, indicating that the plaintiff was cognitively limited and that her maximum physical capacity was light work with occasionally bending/stooping and reaching (Tr. 385-86).

In July 2005, Dr. Rhodes completed a certification to allow the plaintiff to receive extra time off from work through the leave pool (Tr. 260). He also recommended that the plaintiff should surrender her driver's license due to her cognitive deficits (Tr. 262, 267). He completed an Attending Physicians Statement form in connection with the long-term disability claim in which he verified that he had recommended that the plaintiff stop working and that the plaintiff was totally disabled (Tr. 421-22).

By July 26, 2005, the plaintiff reported to Dr. Trouche that her mania and mood swings were controlled by her medications (Tr. 319). On August 2, 2005, Dr. Trouche completed a Physicians Report – Psychiatric assessing a GAF score of 45.[3] He also indicated that in his opinion the plaintiff had moderately severe behavioral or cognitive impairment with a possible frontal lobe problem. He assessed "marked" impairment in social functioning; concentration, persistence, pace; and adaption to stressful conditions based on standards from the *AMA Guides to Evaluation of Permanent Impairment*, 4th

---

[3]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

Edition.[4]  Dr. Trouche went on to indicate that the plaintiff's ability to function outside of highly structured settings was "poor."  He also indicated that the treatment was of some help but still quite problematic; the plaintiff's motivation was "good"; there was no malingering; that the plaintiff was unable to work for any employer; and that the anticipated return to work date was unknown (Tr. 441).

In October 2005, Dr. Lucas reviewed results of a new brain MRI performed in September 2005, which showed no changes from the March 2005 MRI.  On clinical examination, the plaintiff was mildly tremulous, had the slightest of expressive disfluency and subtle tremor with her hands outreached.  Dr. Lucas noted that the plaintiff complained of daily nagging headaches and that she was doing much better "as far as her somatoform disorder" (Tr. 243-44).

In January 2006, the plaintiff called Dr. Rhodes stating that she wanted her driver's license back (Tr. 359).  In May 2006, the plaintiff returned to Dr. Rhodes who gave her the permission to begin driving again (Tr. 358).

At a follow up on March 16, 2006, Dr. Lucas noted that the plaintiff had continued to decline, having lost fifteen pounds and weighing only ninety-eight pounds.  He noted that she continued to smoke although not as much as before and that she had undergone an emergency CT scan of the brain after she had a terrible headache and felt something pop in her head.  The CT scan was unrevealing.  Dr. Lucas arranged for a lumbar puncture to rule out the possibility of a cancerous process or atypical multiple sclerosis (Tr. 383-84).  The results of the lumbar puncture were negative (Tr. 375, 381).

On March 31, 2006, the plaintiff underwent a psychological evaluation by Cashton B. Spivey, Ph.D. (Tr. 323-27).  The plaintiff complained of memory deficits as well as balance and coordination problems (Tr. 323).  Intelligence testing with the Wechsler

---

[4] The form defined "marked" limitation as "impairment levels significantly impede useful function" (Tr. 442).

Adult Intelligence Scale-Revised ("WAIS-R") showed scores in the low average to borderline range, and academic testing with the WRAT-R showed that she functioned at the 10th to 12th grade levels (Tr. 325). Based on the Wechsler Memory Scale, the plaintiff's scores fell in the average range for attention and concentration functioning and suggested "no significant impairment related to those areas." However, use of the Russell Procedure revealed "mild-to-moderate immediate and short-term verbal memory deficits, intact immediate visual memory functioning, and mild short-term vision memory loss." Dr. Spivey concluded that the plaintiff demonstrated "intact attention and concentration functioning" and "mild-to moderate auditory memory deficits." He assessed depressive order, not otherwise specified, with a current GAF of 50[5] and a GAF of 55[6] for the previous 12 months (Tr. 325-26).

At the request of the State agency, the plaintiff underwent a consultative neurological examination by Kerri A. Kolehma, M.D., on April 12, 2006. The plaintiff was quite tearful during the examination, and there were abnormal neurological findings including brisk upper extremity reflexes, hyperreflexic reflexes of the lower extremities, and positive clonus bilaterally. She had normal muscle bulk and tone, well-defined musculature in all extremities, a normal gait, the ability to heel and toe walk without difficulties, no loss of balance on tandem walking, equal muscle strength in all muscle groups, decreased right upper and lower extremity sensation, tangential in her speech, and normal range of motion. On the mini-mental status exam, she missed one word with short-term memory. Dr. Kolehma recommended psychological testing and speech therapy and recommended that the plaintiff not climb stairs, ropes, or ladders (Tr. 330-33).

---

[5] A GAF rating of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *DSM-IV* at 30-33.

[6] A GAF rating of 51-60 indicates moderate symptoms or moderate difficulty in in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). *DSM-IV* at 30-33.

On April 16, 2006, Jeffrey Vidic, Ph.D., a State agency psychological consultant, reviewed the evidence of record and concluded that the plaintiff's mental impairment was "not severe" (Tr. 334-47). He assessed mild limitations in social functioning and maintaining concentration, persistence, or pace (Tr. 344). On April 18, 2006, George T. Keller, III, M.D., a State medical consultant assessed no physical limitations except for climbing and exposure to hazards (Tr. 348-55).

On June 8, 2006, Dr. Lucas saw the plaintiff and noted that even though she had done "relatively well for a while," she had started to experience more TIAs and that she felt that she should have gone to the hospital for these symptoms on at least three occasions. She was having more difficulty with speech, felt weak, could not concentrate, and got lost at times. Dr. Lucas again expressed the opinion that the "vast majority of her symptoms appear to be psychiatric in origin and may be related to the issue surrounding her daughter." He recommended continued psychiatric treatment (Tr. 375-76).

On July 6, 2006, Dr. Lucas noted that the plaintiff had "faintly brisk reflexes diffusely," which were unchanged, that she was distractible and had pseudo speech disorder. His impression was "psychiatric illness with history of sexual abuse strongly raises the possibility of conversion somatoform symptomatology" (Tr. 372).

On July 29, 2006, William Crosby, a State medical consultant, assessed no physical limitations except for climbing and exposure to hazards (Tr. 364-71).

On July 31, 2006, Manhal Wieland, a State agency psychological consultant, reviewed the evidence of record and assessed a cognitive disorder with severe impairment with moderate limitations in social functioning and the ability to maintain concentration, persistence, or pace. On a Mental Residual Functional Capacity Assessment form, the consultant opined that the plaintiff may have difficulties sustaining concentration and pace on complex tasks and detailed instructions; she should be able to attend to and perform simple tasks for two+ hours without special supervision; she may miss occasional days due

to her mental condition; and she would function better in a slower-paced, lower-stress work environment.  He also found that she may find work with the general public stressful at this time (Tr. 394-410).

The State agency sent a questionnaire to Dr. Rhodes concerning the plaintiff's mental impairments, which was completed on July 30, 2006.  Dr. Rhodes indicated that the plaintiff's thought processes were slowed, her mood/affect was worried/anxious and depressed, and her attention/concentration and memory were "poor."   He assessed "moderate" work-related limitation in function due to the mental condition (Tr. 393).

On October 2, 2006, the plaintiff saw neurologist Thomas F. Stout, M.D., for examination at the request of Dr. Rhodes.  The examination revealed no abnormalities of the neck or extremities. The plaintiff was alert and oriented times four with normal attention and normal language. She had no abnormalities of her memory and gave a good representation of her past medical history. She had normal motor strength in all extremities, normal coordination, normal gait and station, and normal sensation. He assessed "mild cognitive impairment," paresthesias, and prior episodes of syncope.  He also indicated that he concurred with Dr. Lucas in that he suspected that "the brunt of the plaintiff's complaints is psychosomatic in nature."  He went on to indicate that in order to give her the benefit of the doubt, he would certainly need to consider unusual presentations of endocrinologic and/or rheumatologic or autoimmune types of processes.  He recommended further follow-up with her psychiatrist and psychologist (Tr. 423-25).

Dr. West conducted a second neuropsychological evaluation of the plaintiff on October 18, 2006, upon referral of her attorney.  Dr. West commented that, where necessary, he utilized different tests to reduce the likelihood of "practiced effects" on the test results. Objective testing showed improvement in motor skills. The Stroop test showed some improvement in processing speeds, but was still in the low average to borderline range at the 12th lowest percentile. Testing with the Connor's Continuous Performance

Test, II Edition, suggested some worsening of continuous attention regulation, along with some evidence of worsening for arousal maintenance, which was complicating her continuous attention. Learning and memory functions were in the average to above-average range for learning and memory of visiospatial procedures.  Language functions were continued to be poor, and there was evidence of continued depression and anxiety with elevated scores on paranoid ideation and obsessive compulsive tendencies, suggesting continued mood disorder with vacillation of mood and cognitive affects.  Dr. West felt that the plaintiff continued to need psychiatric intervention with a brief course of cognitive rehabilitation therapy provided by a speech and language therapist who could deal with the word disfluency concerns and attention regulation problems.  He also felt that there was need to attend to the sleep disturbance because this was exacerbating her attention regulation.  Dr. West concluded that the plaintiff exhibited a neurocognitive disorder possibly related to mixed ideology of TIA and concussion and mood disorder with mood vacillation with significant sleep disturbance suspected (Tr. 427-30).

Dr. Trouche completed another Physicians Report – Psychiatric form on December 7, 2006, assessing a GAF of 50 and indicating that the plaintiff had numerous limitations in social functioning, cognitive functioning, as well as problems in her ability to regularly attend work or to drive vehicles or machinery.  He indicated again that the plaintiff showed good motivation, no malingering, and was unable to work due to her condition (Tr. 435-37).  She returned to Dr. Trouche in February 2008 and July 2008 (Tr. 434, 472).

Dr. West completed several questionnaires in July 2008 regarding the plaintiff's functional limitations (Tr. 453-461).  Upon examination on July 9, 2008, the plaintiff informed Dr. West that she filed for retirement because Drs. Rhodes and Lucas "would not let her go back to work." She related that she had no horses "now" and stayed at home, cleaned, cooked, exercised, socialized, and was sleeping better. Her mood was dysphoric and affect labile. Her diagnoses were mild cognitive impairment and depression

14

with anxiety (Tr. 447).  Dr. West completed an Examining Psychologist's Statement finding that the plaintiff's mental impairments had met the "A," "B," and "C" criteria of Listing 12.02 (organic mental disorder) and the "A" and "B" criteria of Listing 12.04 (affective disorder) (Tr. 453-460).  He also opined that the plaintiff was unable to return to her past relevant work; she had been unable to sustain the mental demands of full-time work at any level of skill or psychological stress since March 2005; and she was not able to do full-time work (Tr. 461). Dr. West also completed a Mental Residual Functional Capacity Assessment form in which he found that the plaintiff was "markedly limited" in eight areas of mental functioning and "moderately limited" in ten areas of mental functioning (Tr. 450-52).  Referring to his previous psychological reports, Dr. West stated:

> Patient displayed poor attention regulation especially for sustained, ongoing tasks, resulting in frequent errors. She does not display encoding memory deficits, but her poor attention regulation undermines her taking in new information correctly.
>
> Also, the patient has significant mood disturbance w/ anxiety. As a result, she would be prone to irritability and hostility, especially with the public

(Tr. 451-52).

The plaintiff returned to Dr. Lucas on August 25, 2008 (Tr. 464-65). The plaintiff reported that she still had difficulty with focusing and with memory; she could not get words out at times; she had episodes that felt like TIAs; and she had some headaches about two to three days per week (Tr. 464).  Dr. Lucas reviewed Dr. West's October 2006 neuropsychological evaluation and recommended a trial of cognitive rehabilitation as Dr. West had recommended, as well as smoking cessation (Tr. 464).

On August 29, 2008, the plaintiff sought emergency room treatment at Trident Medical Center, complaining of weakness, headache, chest pains, and impaired speech. The initial assessment was clinical depression, dizziness, headaches, possible cerebrovascular accident, possible TIA, and possible migraine headache (Tr. 851).  The

15

plaintiff was admitted and underwent various tests, including an EKG, x-rays, CT scan, and an analysis of her blood and urine. The tests showed nothing remarkable, and she left the hospital later the same day against medical advice (Tr. 848-56).

The plaintiff saw Dr. Lucas again on October 6, 2008, and reported that she had gone to the emergency room after her last visit with increased confusion, slurred speech, and stuttering. Dr. Lucas recommended another MRI to look for any progression of the microvascular disease and concurred again in Dr. West's recommendation for cognitive rehabilitation. An MRI of the brain was performed in October 2008 showing relatively mild changes in the increased cerebral white matter signals. It was noted that these findings were more than expected for the patient's age. The radiologist concluded that these findings could be related to microangiopathy, demyelinating disease, collagen vascular disease, and migraine headaches, among many other etiologies (Tr. 463-66).

On November 10, 2008, Dr. West conducted a third neuropsychological evaluation on the plaintiff. The test results showed modest worsening of motor functioning of the dominant hand; impaired language functioning, which reinforced an interpretation of frontal lobe disturbance; a decline in mental processing speeds and attention regulation to the lowest 2nd percentile (problems commonly seen in individuals with frontal lobe disturbance); decreased immediate memory in the lowest 5th percentile; and continued depression, thought disturbance, interpersonal relationship difficulties, self-defeating thought process, and social anxiety with continued somatoform concerns. Dr. West concluded that attention function and regulation of information, including processing speeds, had deteriorated from 2006 to November 2008. He assessed neurocognitive disorder of mixed etiology secondary to small vessel disease and post-concussive syndrome and mood disorder (mild) (Tr. 467-71). He concluded with the following statement:

16

At the request of Mr. Wendt and in response to the reviewer's statements, this patient's functions are in the lowest 2nd percentile for most of the processing speed and attention regulatory functions. I find it very difficult to believe that anyone at that level of functioning would be able to handle an ongoing work task, without timed completion of tasks becoming extraordinary and not cost effective. Other issues may be debated regarding work settings, such as public contact, etc., as they have bearing on stress factors. However, attention regulation is required in all tasks, which is clearly compromised here and has been since 2005. These findings appear to be consistent with other studies, including Dr. Spivey's, who indicates mild to moderate immediate and short-term verbal memory deficits. It is important to note that he is using the Russell Measures, which are sensitive to attention regulatory problems. This, by no means, is considered a detailed neuropsychological evaluation by Dr. Spivey. Further, Dr. Stout and his review of the patient found mild cognitive impairment, which does suggest significant disturbance in cognitive functions, in order to achieve that diagnosis. Finally, Dr. Lucas clearly indicates MRI effects of white matter changes, which, unfortunately, lead to cognitive decline.

(Tr. 471).

In July 2009, Dr. Rhodes referred the plaintiff to Thomas A. Duc, Jr., M.D., Pain Associates of Charleston, to discuss pain management for her back and leg pain. Dr. Duc discussed differential diagnoses for her problems but did not prescribe a course of injection therapy or potent analgesics until he had a chance to review Dr. Lucas's notes (Tr. 857).

On February 17, 2010, the plaintiff was examined by Edward Hogan, M.D., of MGH Health, Inc. in Augusta, Georgia, upon referral by Dr. Rhodes for an assessment of possible multiple sclerosis ("MS"). Dr. Hogan ordered a number of tests, including a cranial MRI, which was compared to an earlier scan done in 2000. Dr. Hogan noted abnormalities during the examination in the areas of recent/remote memory, hearing and deep tendon reflexes ("DTRs"), particularly at the knee and ankles. In reviewing the MRI, he found "two pontine lesions, a lesion involving the anterior limb of the internal capsule on the right and several scattered white matter lesions in centrum semiovale. There is a

17

suggestion of linear increased signal on sagittal view above the corpus callosum that is suggestive but not definitely Dawson's finger appearance."  (Tr. 866-72).  Dr. Hogan's impression was as follows:

> This is a rather atypical neurological syndrome with prominent cognitive dysfunction and definite reflex abnormality in the lower extremities. The cranial MRI scan is compatible with multiple sclerosis. I believe that Dr. Rhodes is correct and this patient has an atypical form of multiple sclerosis, beginning with relapses and becoming progressive with significant cognitive dysfunction and corticospinal reflex disorder. It is relapsing and remitting MS (RRSPMS) with significant disability that is mainly cognitive: my EDSS17 (Extended Disability Status Score) is 5.5.

(Tr. 867).  Dr. Hogan recommended that the plaintiff begin immunomodulatory therapy and the initiation of Copaxone therapy.  "This patient certainly warrants medical disability for social security after neurologic assessment" (Tr. 868).

On March 19, 2010, Dr. Rhodes noted that a doctor in Georgia had diagnosed the plaintiff with MS and was going to try Copaxin (Tr. 880).  On March 17, 2011, Dr. Trouche noted that the plaintiff was still not on Copaxin because "Dr. Lucas told patient she did not have MS but physician in GA told her she did" (Tr. 896).

### Hearing Testimony – July 22, 2008

The plaintiff testified that she experienced many TIAs in which she would slur her words, drop things, lose her balance, lose her focus, and have difficulty driving.  She said it was "like being drunk without knowing it." From 2006 through 2008 she had these events only occasionally – three to four times per month (Tr. 40-44).  The episodes would usually last from a few minutes to a couple of hours, and they would give her a headache and leave her feeling tired (Tr. 42-43).  Many times she would take a nap after an episode (Tr. 43).  The plaintiff also testified that she had ongoing cognitive deficits including memory problems,  reduced  reading  comprehension,  difficulty  maintaining  attention  and

18

concentration, frustration, intolerance, emotional difficulties, sleeping problems, and organizational difficulty (Tr. 46-48, 51).

The plaintiff described her daily activities as being limited. She lived in the country, did very little driving, and mostly stayed at home (Tr. 49-51). Her 13 year-old daughter helped her out a lot around the house and handled her school studies and activities on her own (Tr. 48-49).

### Hearing Testimony – April 23, 2013

At the remand hearing, the plaintiff testified that she is still receiving disability benefits from the South Carolina Retirement System (Tr. 534-35). She continues to have TIA episodes where she loses her balance, has problems remembering and staying focused, slurs her words or stutters, and loses the ability to see and hear clearly. It also takes her longer to do things. Her 30 year old son thinks she has Alzheimer's because "I don't remember things or I might lose my balance" (Tr. 539-40). She also has arthritis, mostly in her hands. Also, her legs don't always work, and she has lost muscle tone. She has asked the doctor for braces, but "he said no because he said the muscle would finish deteriorating. So he'd holding off on that." The plaintiff also testified that her vision "comes and goes" as well (Tr. 542-43).

The plaintiff testified that her treating psychiatrist is Dr. Trouche.[7] He has changed her medications often because they "quit working" and cause problems with sleeping and depression. Dr. Kelly is now her neurologist, and she was previously treated by Dr. Lucas. Her primary care physician, Dr. Rhodes,[8] referred her to Dr. Kelly. She is currently taking medicine for her neurological problems but does not know if it is working. She takes Flexeril but testified that it does not always work (Tr. 537-41)

---

[7]  His name is misspelled throughout the record as "Dr. Trush."

[8]  His name is misspelled throughout the record as "Dr. Rose."

19

The plaintiff testified that it takes her an hour to take a shower and that her 18-year old daughter "does most everything." Concerning her daily activities, she watches television and sleeps "a lot" and stays pretty close to home. She can take a shower but it takes an hour. While she has a driver's license, she is afraid to drive "[b]ecause I don't know when the episodes are coming or when my vision's going to blur," so her daughter usually drives. Her daughter also does most of the chores because she gets muscle spasms and pulls her back (Tr. 539-41)

The vocational expert described the plaintiff's past work experience as encompassing: (1) general clerk, DOT # 209.562-010, light exertional work, SVP of 3, at the beginning of semi-skilled; (2) data entry or key-in, DOT # 203.582-054, sedentary exertional level, SVP of 4, mid-range semi-skilled; and administrative clerk, DOT # 219.362-010, light exertional level, SVP of 4, mid-range of semiskilled (Tr. 544). The ALJ ultimately relied on the vocational expert's response to a hypothetical question that assumed an individual of the plaintiff's age, education, and past work experience who was limited to light work but could not climb ropes, ladders, or scaffolds; work in unprotected heights or around hazardous machinery; was limited to simple, routine, repetitive tasks where changes are infrequent and introduced gradually; with only casual interaction with general public; and is better off working alone (Tr. 545-47). The vocational expert testified that the individual could perform light work as a maid (DOT # 323.687-014) with an SVP of 2; laundry garment packer (DOT # 920.687-018) with a SVP of 1; and mail clerk in private organizations (DOT # 209.687- 026), SVP of 2 (Tr. 547-48).

Upon cross-examination by counsel, the vocational agreed that an employee must be able to focus and concentrate for at least two hours at a time with normal breaks, for four distinct work periods (Tr. 548-49). The vocational expert further agreed that if the individual has a marked limitation such that "the individual would not be able to stay on task to accomplish the performance skills," all jobs he identified would be eliminated. He

elaborated that even jobs that only involve "simple, routine repetitive tasks," still require attention and concentration to that degree (Tr. 549). The vocational expert further testified that if psychologically based symptoms caused a marked limitation so that an employee was unable to sustain or usefully perform "it would preclude all work" (Tr. 550). Also, if a person is not able to consistently meet that time frame in terms of pace, then he or she would not be able to work at any exertional level or skill (Tr. 551).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) according only minimal weight to Dr. West's opinions; (2) failing to make a proper residual functional capacity ("RFC") assessment; and (3) failing to pose a complete hypothetical to the vocational expert to establish that other jobs existed in the national economy that she could perform. As noted above, the plaintiff alleges disability since March 8, 2005, and her date last insured is December 31, 2010.[9]

### *Examining Physician*

The plaintiff first argues that the ALJ erred in according only minimal weight to the opinions of examining neuropsychologist Dr. West (pl. brief 25-36). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or

---

[9] To qualify for DIB, the plaintiff must prove that she became disabled prior to the expiration of her insured status. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a); *Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005).

"unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

As discussed more fully above, Dr. West performed neuropsychological evaluations of the plaintiff at the request of Dr. Lucas in April 2005 and at the request of the plaintiff's attorney in October 2006 and November 2008.  In 2005, he diagnosed cognitive disorder not otherwise specified with evidence of attention regulation problems, naming difficulties, slow processing speeds, and slow reaction times all suggestive of frontal lobe focal concerns; mood disorder with cycling characteristics noted by psychometric measure; and somatoform disorder to be ruled out through psychiatric evaluation. Dr. West indicated that efforts should be made to rule out a possible sleep disorder and possible encephalopathy. (Tr. 221-22).  In July 2005, he indicated that the plaintiff was unable to work due to cognitive limits and that expected response to treatment was "fair" (Tr. 432-33). In October 2006, Dr. West concluded that the plaintiff exhibited a neurocognitive disorder possibly related to mixed ideology of TIA and concussion and mood disorder with mood vacillation with significant sleep disturbance suspected (Tr. 427-30).  In July 2008, Dr. West opined that the plaintiff's mental impairments met the "A," "B," and "C" criteria of Listing 12.02 (organic mental disorder) and the "A" and "B" criteria of Listing 12.04 (affective disorder) (Tr. 453-60).  He also opined that the plaintiff was unable to return to her past relevant work; she had been unable to sustain the mental demands of full-time work at any level of skill or psychological stress since March 2005; and she was not able to do full-time work (Tr. 461). Dr. West also completed a Mental RFC Assessment form in which he found that the plaintiff was "markedly limited" in eight areas of mental functioning and "moderately limited" in ten areas of mental functioning (Tr. 450-52).  In November 2008, Dr. West concluded that attention function and regulation of information, including processing speeds, had deteriorated from 2006 to November 2008. He assessed neurocognitive

disorder of mixed etiology secondary to small vessel disease and post-concussive syndrome and mood disorder (mild) (Tr. 467-71).

The ALJ gave Dr. West's opinions "minimal weight as Dr. West is not a treating physician" (doc. 500). In addition, the ALJ discounted the weight given to Dr. West's opinions for the following reasons: 1) the second and third evaluations were done at the request of the plaintiff's attorney; 2) Dr. West's findings "directly contradict the findings of the treating neurologist, Dr. Lucas, of 'mild microvascular disease'"; 3) Dr. West's findings directly contradict "the objective evidence including MRIs of the brain revealing mild small vessel changes"; 4) Dr. West's findings of "slow processing speeds and attention regulatory problems suggesting decline in frontal lobe functioning" are "inconsistent with Dr. Lucas's assessment and other objective evidence"; 5) Dr. West's finding that the plaintiff's "decline in cognitive functioning is due to post-concussive syndrome with worsening frontal lobe disturbances affecting dysnomia and word fluency" is given minimal wight "in light of records from Dr. Lucas, Dr. Stout, and Trident Hospital which suggested that the claimant may have been exaggerating symptoms or that her symptomology could be attributable to psychiatric issues including conversion somatoform symptomology"; 6) while Dr. West stated that his finding that the plaintiff could complete work tasks in a timely manner was supported by Dr. Spivey's finding of mild-to-moderate short-term verbal memory deficits, Dr. Spivey's evaluation was not a detailed neuropsychological evaluation; 7) Dr. West appears to overstate Dr. Spivey's assessment of the plaintiff's short-term memory deficits, as Dr. Spivey did not recommend any limitations related to the plaintiff's memory; 8) Dr. West appears to overstate Dr. Stout's assessment of a mild cognitive impairment by stating that it "suggests significant disturbance in cognitive functions," as Dr. Stout observed the plaintiff's complaints appear to be psychosomatic and Dr. Stout did not perform a full mental status exam; and 9) Dr. West appears to overstate Dr. Lucas's assessment of the plaintiff's condition, as Dr. West failed to acknowledge that although Dr. Lucas assessed white matter

23

changes leaded to cognitive decline, Dr. Lucas assessed those changes as mild and noted that the plaintiff's symptomology was largely psychiatric and could be conversion somatoform symptomology (Tr. 500).

The plaintiff argues that, while Dr. West is not a treating physician and therefore his opinion is not entitled to controlling weight, his opinion is entitled to significant weight as he is the only neuropsychologist who evaluated her, and he evaluated her three times over several years, which gave him a longitudinal perspective of her condition much like that of a treating physician (pl. brief 29). Further, the plaintiff argues that the ALJ erred in discounting Dr. West's opinions because the 2006 and 2008 opinions were solicited by her counsel. As noted by the plaintiff, the 2005 report contained similar findings to the later reports and was prepared at the request of Dr. Lucas, the plaintiff's treating neurologist. Furthermore, Dr. West completed a disability rating form in July 2005, prior to any contact with counsel, in which he opined that the plaintiff was unable to work and that her expected response to treatment was fair (Tr. 432-44).

The plaintiff also argues (pl. brief at 31-32) that the ALJ's finding that Dr. West's opinions "directly contradict the findings of . . . Dr. Lucas of 'mild microvascular disease' and the objective evidence including MRI's of the brain revealing mild small vessel changes" (Tr. 500) is not based upon substantial evidence. Specifically, Dr. Lucas concurred with Dr. West's findings and followed his recommendations (Tr. 430, 464, 860). After reviewing Dr. West's 2008 evaluation, Dr. Lucas stated that he agreed with the "possibility of some concussive effect, as delineated by Dr. West" and recommended "a trial of cognitive rehab as he recommended" (Tr. 464). On July 2, 2009, Dr. Lucas stated that the plaintiff has "some frontal lobe cognitive dysfunction, and question in the past of a somatoform disorder," and his impression was "[c]ognitive loss as previously delineated with white matter changes felt to be microvascular from elevated domocysteine and continued

24

tobacco abuse" (Tr. 860). Furthermore, the ALJ points out that Dr. Lucas never indicated that the plaintiff was exaggerating her symptoms as the ALJ implied (*see* Tr. 500).

The plaintiff also argues (pl. brief at 32-33) that the ALJ's finding that Dr. West "overstate[d]"  Dr. Stout's assessment is not based upon substantial evidence because the fact that "her symptomology could be attributable to psychiatric issues including conversion somatoform symptomology" does not suggest exaggeration, as the ALJ implied (*see* Tr. 500).   As noted by the plaintiff, a somatoform disorder, which includes a somatization disorder, conversion disorder, pain disorder, and hypochondriasis, is defined as a "psychological disorder in which the physical symptoms suggest a general medical condition and are not explained by another condition such as a medication or another mental disorder," and the "symptoms must be clinically significant enough to impair function." *Taber's Cyclopedic Medical Dictionary* 2026 (20th ed. 2005). It is also specifically recognized by the Commissioner as a listed impairment. *See* 20 C.F.R. Pt. 404, Subpt. P. App. 1, Listing 12.07 (Somatoform Disorders).

The plaintiff further argues (pl. brief 33-34) that the ALJ's contention that Dr. West "overstate[d] Dr. Spivey's assessment of the plaintiff's short-term memory deficits to support his opinion" is not based upon substantial evidence (*see* Tr. 500). Dr. Spivey, a consultative psychologist, evaluated the plaintiff at the request of the State agency on March 31, 2006 (Tr. 323-27). When Dr. West first saw the plaintiff on April 25, 2005, he reported that testing yielded a "full-scale IQ estimate of 99 and in average range" (Tr. 220). When she was evaluated by Dr. Spivey about a year later, the results of the WAIS-R revealed a "Verbal IQ score of 88, a Performance IQ score of 78, and a Full Scale IQ score of 83," with the Performance IQ in the borderline range (Tr. 325). Dr. Spivey further stated that "[u]se of the Russell procedure revealed mild-to-moderate immediate and short-term verbal memory deficits, intact immediate visual memory functioning and mild short-term visual memory loss" (Tr. 326). Dr. West commented on these findings in his 2008 opinion,

25

indicating that the Russell measures are "sensitive to attention regulatory problems" (Tr. 471). Dr. West further stated that his findings "appear to be consistent with" Dr. Spivey's report, though he noted that Dr. Spivey did not conduct a detailed neuropsychological evaluation (*Id.*).

The ALJ stated as follows in the decision: the "validity of [Dr. Spivey's] assessment is weakened by the fact that Dr. West also concedes that Dr. Spivey's evaluation was not a neuropsychological evaluation but rather it was based on one examination of the claimant for consultative purposes" (Tr. 500). However, as noted by the plaintiff, the significance of Dr. West's statement was that, even with his less comprehensive examination, Dr. Spivey also found that the plaintiff has mild to moderate memory deficits, which is consistent with Dr. West's findings. The ALJ further stated that Dr. West "also seems to overstate Dr. Spivey's assessment of the claimant's short-term memory deficits to support opinion, as Dr. Spivey did not recommend any limitations related to her memory" (Tr. 500; *see* Tr. 323-27). However, as noted by the plaintiff, Dr. Spivey did not complete any functional assessment. Further, he opined that the plaintiff's GAF was 50, which indicates "serious symptoms (e.g., suicidal ideation, severe obsessional ritual, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning, (e.g., no friends, unable to keep a job)." *DSM-IV* at 32.

The Commissioner does not specifically address the plaintiff's arguments above but instead provides other reasons not stated by the ALJ for discounting Dr. West's opinions (def. brief 15-19). *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). As will be discussed below, the undersigned recommends remand for further consideration of the plaintiff's RFC. The undersigned also recommends that the ALJ be instructed to

further consider the opinions of Dr. West in light of the arguments of the plaintiff outlined above.

***Residual Functional Capacity***

The plaintiff next argues that the ALJ's RFC finding is not supported by substantial evidence (pl. brief 37-41). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

27

In this case, the ALJ found that the plaintiff maintained the ability to perform light exertional level work, with the non-exertional limitations of no climbing of ladders, ropes, or scaffolds; no working at unprotected heights or around hazardous machinery; and performing only simple, repetitive, and routine tasks in an environment where changes were infrequent and were introduced gradually, and where there was only casual interaction with the general public (Tr. 494-502).

The plaintiff specifically argues that the ALJ's statement that the RFC assessment was supported by Dr. Lucas's July 2005 Attending Physician's Statement is not supported by substantial evidence (Tr. 502). As the ALJ himself noted in his decision, in the July 2005 statement to which he gave "significant weight" (*Id.*), Dr. Lucas "limited the claimant to sitting for eight hours, standing and walking each for four hours of an eight-hour day with no lifting more than 20 pounds occasionally and 10 pounds frequently and only *occasionally* stooping and *reaching*" (Tr. 499 (citing Tr. 385-86) (emphasis added)). However, the ALJ did not incorporate this reaching limitation into his RFC finding nor did he provide reasons for rejecting this limitation. While the Commissioner is correct that an ALJ is not required to adopt all aspects of a medical expert's RFC assessment as it is the ALJ's responsibility to make a finding as to a claimant's RFC (def. brief 19-20), this does not mean that an ALJ can ignore the limitation or fail to explain his rejection of the limitation. *See* SSR 96-8 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Without an explanation of the ALJ's consideration of this evidence, this court cannot determine whether the RFC assessment was based upon substantial evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citations omitted). Such an explanation is particularly important here as the ALJ relied on Dr. Lucas's opinion as a basis to reject other medical source opinions (*see* Tr. 499 (rejecting Dr. Rhode's assessment as "the record fails to document

28

any report from Dr. Lucas restricting the claimant from all work activity," referencing the July 2005 Attending Physician's Statement); (Tr. 500-501) (only according "some weight" to Dr. Hogan's opinion, deferring "to the neurologic opinion of Dr. Lucas as he has a longstanding relationship with the claimant")).

Furthermore, the limitation to occasional reaching is of material significance here as the three representative occupations identified by the vocational expert in response to the ALJ's hypothetical question require frequent reaching:  housekeeping (DOT # 323.687-014), laundry bagger (DOT # 920.687-018), and mail clerk (DOT # 209.687-026) (Tr. 503; *see* docs. 13-2, 13-3, 13-4 (job descriptions)).

Based upon the foregoing, the undersigned recommends that this case be remanded and the ALJ be instructed to reassess the plaintiff's RFC considering all of the medical opinions of record, including the opinions of Dr. West and Dr. Lucas's limitation to occasional reaching.  Furthermore, if necessary, the ALJ should be instructed to obtain new vocational expert testimony regarding whether there is other work in the national economy that the plaintiff could have performed prior to her date last insured.

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 14, 2015
Greenville, South Carolina

29